

**FILED**

MAY 1 6 2013

Clerk, U.S. District Court
District Of Montana
Missoula

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| NOLAN SALIX; COTTONWOOD ENVIRONMENTAL LAW CENTER, | CV 12-45-M-DLC |
| Plaintiffs, | |
| vs. | ORDER |
| UNITED STATES FOREST SERVICE; FAYE KRUEGER, in her official capacity as Regional Forester for the U.S. Forest Service, Region One, | |
| Defendants. | |

Before the Court are the parties' cross-motions for summary judgment. For the reasons discussed below, Plaintiffs' motion is granted and Defendants' motion is denied. As threshold matters, Plaintiffs have standing to challenge the Forest Service's failure to reinitiate section 7 consultation on the programmatic plan amendment at issue here, and the Court has jurisdiction to consider the case because Plaintiffs' notice of intent to sue was adequate. The Court also finds that the Ninth Circuit's decision in *Pacific Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994), *cert. denied* 514 U.S. 1082 (1995) ("*Pacific Rivers (1994)*"), remains good law in this Circuit and that the programmatic plan amendment is thus subject to the Endangered Species Act's requirements that section 7

consultation be reinitiated in certain circumstances.  The designation of critical habitat on forest service lands subject to the plan amendment constituted such a triggering event, and the Forest Service violated the Endangered Species Act by failing to reinitiate consultation.  While the Forest Service must now reinitiate consultation, the Court will not enjoin any specific projects or grant the broad injunctive relief requested by Plaintiffs because Plaintiffs have not made an adequate showing of irreparable harm to support the scope of the injunctive relief requested.

FACTS

In 2000, the Distinct Population Segment of Canada lynx in the contiguous United States was added to the list of threatened species under the Endangered Species Act ("ESA").  In response, the United States Forest Service ("Forest Service") developed the Northern Rockies Lynx Amendment (the "Lynx Amendment" or "Amendment"), a "programmatic plan amendment[]" to the land and resource management plans ("forest plans") of 18 National Forests in the Northern Rocky Mountains analysis area.  The Lynx Amendment is "programmatic in nature, consisting of direction that would be applied to future management activities."  AR 2372 at 4; AR 0101(a)at 4; AR 2535 at 8639.

In 2005, the Forest Service initiated formal consultation with the Fish and

Wildlife Service ("Wildlife Service") on the Amendment, pursuant to Section 7 of the ESA. At that time, the Wildlife Service had not yet designated any critical habitat for lynx on Forest Service lands.[1]  Thus, the consultation did not include any consideration of whether the Lynx Amendment would affect lynx critical habitat.

Section 7 consultation was completed in 2007 when the Wildlife Service issued a Biological Opinion concluding that the Lynx Amendment would not jeopardize the continued existence of the Canada lynx. In a single Record of Decision, the Forest Service then incorporated the Lynx Amendment into the land and resource management plans for 18 national forests.

On February 25, 2009, the Wildlife Service extended critical habitat protections to additional lands in Idaho, Montana, and Wyoming that were already occupied by lynx, including areas within 11 national forests that were impacted by the Lynx Amendment.

Plaintiffs allege that the Forest Service should have reinitiated Section 7 consultation on the Lynx Amendment when lynx critical habitat was designated on

---

[1]In 2006, the Wildlife Service designated some critical habitat for lynx, but none of the designated areas were located on Forest Service lands. Ultimately, the Wildlife Service voluntarily revisited this designation, citing the "improper administrative influence" of Julie MacDonald, former Deputy Assistant Secretary of the Interior.

Forest Service land.  The claim arises under the citizen suit provision of the ESA,

16 U.S.C. § 1540(g)(1)(A).

ANALYSIS

I. Standing

In order to satisfy the case or controversy requirement of Article III, a

plaintiff must establish standing to bring a claim.  *Summers v. Earth Island Inst.*,

555 U.S. 488, 491 (2009).  An organizational plaintiff has standing to sue if its

members would have standing to sue in their own right, the "interests at stake are

germane to the organization's purposes," and the members' participation is not

necessary to the claim or the relief requested.  *Friends of the Earth, Inc. v. Laidlaw

Envtl. Srvcs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

Three elements are essential to member standing: injury in fact, causation,

and redressability.  An "injury in fact" must be (a) "concrete and particularized"

and (b) "actual or imminent, not conjectural or hypothetical."  *Summers*, 555 U.S.

at 493 (citation omitted).  An organization must show, through specific facts, Fed.

R. Civ. P. 56(e), that at least one member has concrete and personal interests in a

specific area of the environment that is affected by the challenged government

action and that the member's interests have been and will be directly harmed by

the government action. *Summers*, 555 U.S. at 494–98.  Additionally, the injury

4

must be "fairly traceable to the challenged action" and likely to be redressed by a favorable decision. *Id.* "A showing of procedural injury lessens a plaintiff's burden on the last two prongs of the Article III standing inquiry, causation and redressability." *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008) (citation omitted). "Plaintiffs alleging procedural injury must show only that they have a procedural right that, if exercised, *could* protect their concrete interests." *Id.* (citation omitted) (emphasis in original).

In the case at hand, Plaintiffs challenge the Forest Service's failure to reinitiate consultation on the Lynx Amendment, which was accomplished through one Record of Decision, but amended 20 separate plans covering 18 national forest units. Plaintiffs have named several specific, affected subareas of the national forests affected by the Lynx Amendment that they use and enjoy. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 484 (9th Cir. 2010) (citing *Idaho Conserv. League v. Mumma*, 956 F.2d 1508, 1517 (9th Cir. 1992)). In several of these areas, the Forest Service has designated critical habitat for lynx. In a few of these areas, Plaintiffs have alleged that their interests face imminent threat because the Forest Service has approved projects without conducting the landscape-level analysis that would take place if the Forest Service reinitiated consultation on the Lynx Amendment. They allege the failure to reinitiate

5

consultation on the Lynx Amendment threatens lynx habitat in these areas and will impair their opportunity to see lynx in the wild.

Defendants claim that Plaintiffs must establish standing to challenge each individual forest plan, that they must also challenge specific projects that rely on the plan, and that they must show that the site-specific analysis for particular projects did not compensate for any injury that might have been caused by the failure to reinitiate consultation on the Lynx Amendment. Defendants argue that Plaintiffs have failed to allege an injury in fact that is traceable to the amendment of the plans for 17 of the 18 forests and that Plaintiffs' allegations of injury in the Gallatin National Forest are negated by the Wildlife Service's determination in site-specific biological opinions that the projects in question would not adversely modify lynx critical habitat. Plaintiffs counter that they have established standing to challenge the single, programmatic Lynx Amendment. It is sufficient, they insist, that they show a single imminent injury to their interests in one specific area in one national forest that is affected by the Amendment.

For the reasons discussed below, Plaintiffs' arguments are more compelling.

## A.

Defendants suggest that *Summers* requires plaintiffs who are challenging a programmatic regulation to also assert (and succeed on) a site-specific, "as-

6

applied" claim challenging a specific project. (*See* doc. 32 at 9–12). However, for the purpose of establishing standing to challenge a programmatic regulation, plaintiffs can allege injury from a project that relies on that regulation without asserting a separate claim against the project.

In *Summers*, the plaintiffs challenged various timber regulations and also challenged the failure of the Forest Service to apply one of the regulations to a particular project, the Burnt Ridge Project. 555 U.S. at 494. They settled the dispute over the Burnt Ridge project before the challenge to the regulations was decided. *Id.* The Supreme Court held that the plaintiffs lacked standing to challenge the regulations since their dispute over the Burnt Ridge project had been resolved. *Id.* But this was not because the separate claim was no longer part of the action. Rather, the only injury the plaintiffs had alleged in their standing affidavits was associated with the Burnt Ridge project. *Id.* at 495. They had not alleged a particularized injury in any other area. The Court held: "We know of no precedent for the proposition that when a plaintiff has sued to challenge the lawfulness of certain action or threatened action but has settled that suit, he retains standing to challenge the basis for that action (here, the regulation in the abstract), *apart from any concrete application that threatens imminent harm to his interests.*" *Id.* at 494 (emphasis added). It was the lack of a concrete application

that threatened imminent harm to the plaintiffs' interests, not the lack of an

independent, project-specific claim, that ultimately impaired the plaintiffs'

standing to challenge the regulations.

The Ninth Circuit's decisions in *Sierra Forest Legacy v. Sherman*, 646 F.3d

1161 (9th Cir. 2011), and *Pacific Rivers Council v. United States Forest Service*,

689 F.3d 1012 (9th Cir. 2012) ("*Pacific Rivers (2012)*"), support this reading of

*Summers*. At issue in *Sierra Forest Legacy* was whether the State of California

and a nonprofit member organization called Sierra Forest Legacy had standing to

challenge a 2004 Framework that established direction for timber projects in 10

national forests and one management unit encompassing some 11.5 million acres.

*Id.* at 1170, 1178–80. The Circuit held that both plaintiffs had standing.

California had standing because of its "unique proprietary interests" as a state. *Id.*

at 1178–79. But Sierra Forest Legacy also "ha[d] standing to bring a facial

challenge to the 2004 Framework, *independent from specific implementing*

*projects*." *Id.* at 1179 (emphasis added). Sierra Forest Legacy's members had

asserted interests in areas encompassed by three timber projects within just one of

the affected forests. *Id.* at 1179–80. Sierra Forest had standing not based on

whether it challenged any of the projects, but because its members asserted

interests in areas that would be affected by specific projects in a forest that was

8

subject to the 2004 Framework.

The Ninth Circuit reached the same conclusion in *Pacific Rivers (2012)*, a case in which the plaintiffs challenged the same 2004 Framework that was at issue in *Sierra Forest Legacy*. The court held that where "there is little doubt that [the plaintiff's members] will come into contact with affected areas, and the implementation of the [programmatic plan] will affect their continued use and enjoyment of the forests," NEPA plaintiffs do not have to "wait to challenge a specific project when their grievance is with an overall plan." 689 F.3d at 1023 (internal quotation marks and citation omitted). The court explained:

> [I]f the agency action only could be challenged at the site-specific development stage, the underlying programmatic authorization would forever escape review. To the extent that the plan pre-determined the future, it represents a concrete injury that plaintiffs must, at some point, have standing to challenge. That point is now, or it is never.

*Id.* (quoting *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1355 (9th Cir. 1994)). *See also Wilderness Society, Inc. v. Rey*, 622 F.3d 1251, 1256–57 (9th Cir. 2010).

Under *Sierra Forest Legacy* and *Pacific Rivers (2012)*, plaintiffs may challenge a programmatic regulation that affects multiple forests so long as they allege a particularized injury in a specific area that is affected by the regulation and that will be subject to an agency action that relies on the regulation. It is not

9

necessary for plaintiffs to assert a separate claim challenging the project or for plaintiffs to assert a particularized injury for every forest subject to the regulation. Plaintiffs' decision not to challenge a specific project in this action does not undermine their standing to challenge the programmatic Lynx Amendment, and they are not required to show a particularized injury in every forest affected by the Lynx Amendment.

**B.**

Defendants also suggest that plaintiffs alleging injury from a specific project that relies on a programmatic plan must prove that the project analysis for that specific site failed to compensate for any injury the programmatic plan might have caused. In the case at hand, Defendants insist that the site-specific biological opinions for the Bozeman Municipal Watershed Project and the East Boulder Project considered the effects of the projects on lynx critical habitat and thereby eliminated any risk that the failure to address critical habitat when consulting on the Lynx Amendment would cause Plaintiffs injury.

Defendants rely on *Ohio Forestry Association, Inc. v. Sierra Club*, 523 U.S. 726 (1998),[2] in support of their argument that Plaintiffs must prove that site-

---

[2] The other cases cited by Defendants, *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010), and *Natural Resources Defense Council v. Salazar*, 686 F.3d 1092, 1098 (9th Cir. 2012), are inapposite. *Wild Fish Conservancy* did not address standing or traceability

specific biological opinions relied upon the programmatic document "in any

unlawful fashion." (Doc. 32 at 11.)  In the NFMA context, the Supreme Court

held in *Ohio Forestry* that forest plans do "not create adverse effects . . . of a sort

that traditionally would have qualified as harm" because "they do not command

anyone to do anything or to refrain from doing anything; they do not grant,

withhold, or modify any formal legal license, power, or authority; they do not

subject anyone to any civil or criminal liability; they create no legal rights or

obligations." 523 U.S. at 733.  Thus, the potential harm posed by a forest plan is

neither imminent nor certain when the forest plan is considered in a vacuum. *Id.* at

734.  A specific project relying on the plan, however, raises the possibility the plan

will cause an injury in fact. *Id.*  The Court stated:

> Any such later challenge [to a project] might also include a challenge to
> the lawfulness of the present Plan if (but only if) the present Plan then
> matters, i.e., if the Plan plays a causal role with respect to the future,
> then-imminent, harm from logging.

*Id.*  Twinning a project challenge with a plan challenge allows the "benefit of the

focus that a particular logging proposal could provide" and avoids "the kind of

abstract disagreements over administrative policies . . . that the ripeness doctrine

---

and *Natural Resources Defense Council* did not address whether a plaintiff has standing to
challenge a programmatic document when the plaintiff has not challenged site-specific projects
or biological opinions implementing the document.

seeks to avoid." *Id.* at 736 (internal quotation marks and citation omitted).

Unlike the case at hand, however, *Ohio Forestry* involved a challenge under the National Forest Management Act ("NFMA").  The Supreme Court explicitly distinguished a NFMA challenge from a challenge brought pursuant to the National Environmental Policy Act ("NEPA"):

> NEPA, unlike NFMA, simply guarantees a particular procedure, not a particular result. . . . Hence a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper.

*Id.* at 737.

Like NEPA, section 7 of the ESA guarantees a particular procedure, not a particular result.  Thus *Ohio Forest*'s requirements that a NFMA challenge to a Forest Plan be combined with a challenge to a project and that Plaintiffs prove the Project improperly relied on the challenged plan do not apply here.

The Ninth Circuit has explicitly rejected the notion that site-specific environmental analyses can cure an asserted procedural injury related to a programmatic regulation:

> Nor could the Forest Service cure flaws in [a land management resource plan] in the [environmental impact statement ("EIS")] for a site-specific project. *See Pit River [Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 785 (9th Cir. 2006)] ("[D]ilatory or ex post facto environmental review cannot cure an initial failure to undertake environmental review.").  We have never held that an LRMP is not subject to facial attack based on an

alleged NEPA violation.

*Sierra Forest Legacy*, 646 F.3d at 1180. It is thus irrelevant that the biological

opinions for the Bozeman Municipal Watershed Project and the East Boulder

Project found that neither project will adversely modify lynx critical habitat. The

possibility of harm is imminent and concrete despite the project-specific decisions

because the Lynx Amendment provides the "big picture approach to lynx

management" and "contributes to the landscape level direction." AR 0101(a) at

70. Even if site-specific environmental analyses are completed, "[e]ffects may

occur and/or continue without appropriate management direction at broad scales."

AR 2375 at 31. *See Idaho Conserv. League*, 956 F.3d at 1516 ("[S]hort of

assuming that Congress imposed useless procedural safeguards . . . we must

conclude that the management plan plays some, if not a critical, part in subsequent

decisions."). Thus Plaintiffs were not required to prove that the site-specific

analyses for the Bozeman Municipal Watershed Project and East Boulder Project

failed to compensate for their alleged injury.

## C.

As in *Pacific Rivers Council (2012)* and *Sierra Forest Legacy*, Plaintiffs

here allege a procedural violation related to a programmatic plan affecting

multiple forests. Six members have submitted affidavits alleging interests in areas

13

of the Gallatin, Custer, Lolo, Flathead, Helena, Custer, Shoshone, and Bridger-Teton National Forests. (Docs. 1-2, 12, 16, 25, 26, 27, 28.) They name specific subareas of these forests in which they recreate, including areas in which lynx critical habitat has been designated. Some of these areas with lynx critical habitat have been and will be affected by specific projects the Forest Service is implementing—including the Bozeman Municipal Watershed Project and the East Boulder Project in the Gallatin National Forest—and several members indicate they have used these areas in the past and have concrete plans to return in the future.[3] (Docs. 1-2 at 2–3; 12 at 2–3; 16 at 2–3; 25 at 2; 28 at 4.) The affiants hunt, hike, ride horses, recreate, and look for wildlife, including lynx, in these areas. They specifically like to visit lynx critical habitat because it offers a better opportunity to see Canada lynx. They are concerned that the lack of consultation on the Lynx Amendment since critical habitat was designated will result in adverse modification to critical habitat in the Forests generally and in the Project areas specifically because of the lack of analysis at the landscape, rather than the site-specific, level. (Docs. 25–28.)

Plaintiffs have demonstrated that the affiants have a connection to several

_____

[3] One affiant is also connected to the Colt Summit Project area in the Lolo National Forest, but it is not clear whether this project area contains lynx critical habitat.

14

areas that contain lynx critical habitat and are affected by the Lynx Amendment

and that they have "specific and concrete" plans to return to and use these areas.

*Summers*, 555 U.S. at 494–95.  They have shown that their risk of harm is actual

and imminent because specific projects guided in part by the Lynx Amendment are

being implemented in areas they use and plan to return to.  They have shown the

alleged procedural injury "affects the recreational or even the mere esthetic

interest[s]" of Cottonwood Environmental Law Center members and that it is

possible that a favorable decision in this case could redress their alleged injuries.

*Summers*, 555 U.S. at 494–95.  "Plaintiffs alleging procedural injury must show

only that they have a procedural right that, if exercised, *could* protect their

concrete interests."  *Salmon Spawning & Recovery Alliance*, 545 F.3d at 1226

(internal quotation marks and citation omitted).

> [T]he fact that . . . [re-initiating consultation] might not in any way
> change the [management direction for the projects] is irrelevant. The
> asserted injury is that environmental consequences might be overlooked
> and reasonable alternatives ignored as a result of deficiencies . . . . The
> ultimate outcome following proper procedures is not in question.

*Idaho Conservation League*, 956 F.2d at 1518 (citation omitted).  In summary,

Plaintiffs have established standing to challenge the Lynx Amendment to the 20

forest plans at issue based on the subsequent designation of lynx critical habitat

and the Forest Service's decision not to reinitiate consultation with the Wildlife

Service.

## II. Notice of Intent to Sue

Defendants insist that the Court lacks jurisdiction to consider this case

because Plaintiff's letter of intent to sue under the ESA did not provide adequate

notice of the lawsuit it has filed. A citizen suit under the ESA may not be

commenced "prior to sixty days after written notice of the violation has been given

to the Secretary, and to any alleged violator." 16 U.S.C. § 1540(g)(2)(A)(i). "The

purpose of the 60-day notice provision is to put the agencies on notice of a

perceived violation of the statute and an intent to sue." *S.W. Ctr. for Biological*

*Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998). The

notice must provide sufficient detail "so that the Secretary or [alleged violator can]

identify and attempt to abate the violation." *Id.* at 522. Otherwise, courts lack

jurisdiction to consider the case. *Id.* at 520; 16 U.S.C. § 1540(g)(3)(A).

Plaintiffs' Notice to the government states: "The Government's reliance on

the Northern Rockies Lynx Management Direction without re-initiating formal

consultation violates the Endangered Species Act." (Doc. 23-2 at 3.) It states that

reinitiation of consultation was required under section 7 of the ESA after critical

habitat was designated on national forest land (*id.* at 2), and it identifies the

specific regulatory provisions alleged to have been violated, 50 C.F.R. § 402.16(b)

16

and (d):

> (b) If new information reveals effects of the action that may affect listed
> species or critical habitat in a manner or to an extent not previously
> considered;
>
> . . . . or
>
> (d) If a new species is listed or critical habitat is designated that may be
> affected by the identified action.

(*Id.* at 2–3.) The Notice demands reinitiation of formal consultation on the Lynx

Amendment and a "new biological opinion" analyzing "the designation of new

critical habitat on National Forests" and it informs Defendants of Plaintiffs' intent

to seek declaratory and injunctive relief if corrective action was not taken. (*Id.*)

The Notice does not identify any specific project or national forest that is subject

to the Lynx Amendment.

Plaintiffs provided sufficient notice under 16 U.S.C. § 1540(g)(3)(A). The

single cause of action in the Complaint was described in the Notice. The Notice

identified the statute and regulations allegedly violated and identified the specific

violation complained of, the Forest Service's failure to reinitiate consultation on

the Lynx Amendment once lynx critical habitat was designated on affected lands.

The Complaint alleged the same violation and relied on the same statutes and

regulations.

17

Plaintiffs were not required to provide Defendants notice of a specific project that relied on the Lynx Amendment because they have not challenged a specific project. In contrast, in *Southwest Center for Biological Diversity*, the plaintiffs' complaint and amended complaint specifically alleged that the defendant was jeopardizing the continued existence of the flycatcher, an endangered bird, at Lake Mead, by unlawfully taking flycatchers in the absence of a valid reasonable and prudent alternative and incidental take statement. 143 F.3d at 519. The plaintiffs' 60-day notices, however, had failed to identify either the flycatcher or Lake Mead as a species or area of concern. *Id.* at 520–21. The notices had only generally asserted that the defendants' memorandum of agreement failed to provide for the conservation of federally listed species on the Lower Colorado River. *Id.* Thus, the defendant had no notice of the specific violation the Plaintiffs ultimately alleged and no opportunity to correct it. *Id.*

Here, on the other hand, the Complaint does not challenge a specific project. The specific projects mentioned by Plaintiffs merely establish their standing to challenge the Lynx Amendment. Defendants are well aware of the forests to which the Lynx Amendment applies, the locations where lynx critical habitat has been designated, and the projects that have been initiated or are being considered in those areas. Under Plaintiffs' theory, any such project would pose potential

18

harm because of the lack of consideration on the landscape level of whether the Lynx Amendment adequately protects lynx critical habitat from adverse modification.

The Forest Service did not need Plaintiffs to point to a specific project or forest affected by the Lynx Amendment in order to identify the alleged violation or reinitiate consultation on the Lynx Amendment. *S.W. Ctr.*, 143 F.3d at 522 (finding a notice was sufficient in itself because the agency could have "identif[ied] and attempt[ed] to abate the violation"). A similar notice was adequate in *Lane County Audubon Society v. Jamison*, in which the plaintiffs notified the defendant agency of their intent to sue based on the agency's failure to consult with the Wildlife Service on a programmatic management strategy to protect the spotted owl that set forth the criteria "for logging in the millions of acres administered by the [agency] in Washington, Oregon and California." 958 F.2d 290, 291–92 (9th Cir. 1992).

*Center for Biological Diversity v. Marina Point Development Co.*, 566 F.3d 794, 801 (9th Cir. 2008), is inapplicable here. First, it arose under the Clean Water Act, not the ESA. As the court noted, 40 C.F.R. § 153.3(a) provides a "specific and clear statement of the information that must be included" in a Clean Water Act 60-day notice. *Id.* at 801–02. No analogous regulation exists under the

19

ESA. *Ctr. for Sierra Nevada Conservation v. U.S. Forest Serv.*, 832 F. Supp. 2d

1138, 1174 (E.D. Cal. 2011). Notably, though the court found that the plaintiffs'

notices to the defendants failed to meet the regulation's specific requirements, it

held that the notices appeared to be sufficient under the ESA. *Ctr. for Biological*

*Diversity*, 566 F.3d at 804.

Second, the permit-specific nature of the violations at issue in *Marina Point*

is readily distinguishable from the type of procedural violation on a programmatic

amendment that is alleged here. In *Marina Point*, the Complaint alleged violations

of both §§ 402 and 404 of the Clean Water Act,[4] but the plaintiffs' notices had not

mentioned § 402 at all. The Complaint also raised claims concerning specific

discharges for which the defendants should have obtained permits, but the 60-day

notices did not identify any specific discharges. *Id.* Thus the notices did not

comply with the requirements of 40 C.F.R. § 153.3(a) or provide notice to the

defendants of what corrective actions could be taken to obviate the need for a

lawsuit. Similarly, in *Klamath Siskiyou Wildlands Center v. Macwhorter*,

12-cv-1900-PA (D. Or. April 23, 2013) (doc. 35-2), the plaintiffs filed a complaint

challenging specific mining authorizations, but their Notice of Intent did not

---

[4] Section 402 requires permits for discharges of pollutants into navigable waters. 33
U.S.C. § 1342. Section 404 requires permits for the discharge of dredged or fill materials into
the waters of the United States, including wetlands. 33. U.S.C. § 1344.

identify which mining authorizations they were challenging.

In the present case, Plaintiffs are challenging the failure to reinitiate consultation on the Lynx Amendment, a single programmatic decision that simultaneously amended multiple forest plans. They are not challenging specific projects. Their Notice cites the specific statutory and regulatory language Defendants are alleged to have violated and identifies the specific violation complained of—the failure to reinitiate consultation following the designation of lynx critical habitat in several of the forests subject to the Lynx Amendment. The same violation and the same statutes and regulations are cited in the Complaint and form the basis for this cause of action. (Doc. 1 at 14.) Unlike the plaintiffs in *Marina Point* and *Klamath Siskiyou Wildlands Center*, Plaintiffs have not raised new claims or violations.

Defendants also claim that Plaintiffs' request for relief—that all projects in forest land areas subject to the Lynx Amendment be enjoined pending consultation—exceeds the scope of the Notice because 16 U.S.C. § 1536(d) was not specifically mentioned in the Notice.[5] While the ESA requires plaintiffs

---

[5] This section states: "After initiation of consultation required under subsection (a)(2) of this section, the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a) (2) of this section."

seeking injunctive relief to first provide notice of "the provision or regulation" allegedly violated, it does not state that the notice must specify the statutory provision that authorizes the injunctive relief sought.  16 U.S.C. § 1540(g).  In any case, the Notice provided sufficient warning of the relief that would be sought and the applicable scope of that relief.  It alleged the Forest Service violated "the ESA, 16 U.S.C. § 1531 *et seq.*" and cited the specific regulatory provisions the Forest Service was alleged to have violated.  (Doc. 23-2 at 1.)  It also notified the Forest Service that Plaintiffs would seek declaratory and injunctive relief if the Forest Service failed to reinitiate consultation.  (*Id.* at 3.)  *See Marbled Murrelet v. Babbit*, 83 F.3d 1068, 1073 (9th Cir. 1996) ("The letter clearly gives notice of an intent to sue under the ESA.  Although section 7 was referenced in only one part of the letter, the letter as a whole provided notice sufficient to afford the opportunity to rectify the asserted ESA violations.").

Because the Notice cited the specific statutes and regulations that the Complaint alleges were violated, the Complaint does not raise new claims or grounds for relief, and the Notice provided adequate notice of the relief Plaintiffs intended to seek, Plaintiffs' Notice was adequate under the ESA and this Court has jurisdiction to consider the case.

### III.  Whether *Pacific Rivers (1994)* has been effectively overruled

22

Under section 7(a)(2) of the ESA, an agency must consult with the Wildlife

Service (or the National Marine Fisheries Service) to "insure that any action

authorized, funded, or carried out by such agency (hereinafter in this section

referred to as an 'agency action') is not likely to jeopardize the continued

existence of any endangered species or threatened species or result in the

destruction or adverse modification of habitat of such species which is determined

. . . to be critical." 16 U.S.C. § 1536(a)(2). Sometimes, a federal agency is

required to reinitiate consultation:

> Reinitiation of formal consultation is required . . . where discretionary
> Federal involvement or control over the action has been retained or is
> authorized by law and:
>
> . . . .
>
> (b) If new information reveals effects of the action that may affect listed
> species or critical habitat in a manner or to an extent not previously
> considered;
>
> . . . .
>
> (d) If a new species is listed or critical habitat designated that may be
> affected by the identified action.

50 C.F.R.§ 402.16. The applicable Wildlife Service regulation defines "action" as

"all activities or programs of any kind authorized, funded, or carried out, in whole

or in part, by Federal agencies in the United States." 50 C.F.R. § 402.02.

Defendants claim the Forest Service is not required to reinitiate consultation

on the Lynx Amendment because that action—the amendment of the forest plans

23

in March 2007—was completed at the time of amendment and there is no further

affirmative agency action to be taken. Defendants insist the Ninth Circuit's

contrary opinion in *Pacific Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir.

1994), *cert. denied* 514 U.S. 1082 (1995) ("*Pacific Rivers (1994)*"), has been

"effectively overruled" because it "is clearly irreconcilable with the reasoning or

theory of intervening higher authority." *Miller v. Gammie*, 335 F.3d 889, 899–900

(9th Cir. 2003) (en banc). Specifically, Defendants cite the United States Supreme

Court's opinion in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55

(2004) ("*Norton v. SUWA*"), and a Tenth Circuit opinion, *Forest Guardians v.

Forsgren*, 478 F.3d 1149 (10th Cir. 2007). Defendants also cite a few Ninth

Circuit cases that they contend support their position. Plaintiffs, of course, argue

that *Pacific Rivers (1994)* is controlling and that the cases relied on by Defendants

are distinguishable or actually support Plaintiffs' position.

In *Pacific Rivers (1994)*, the Ninth Circuit held: "Given the importance of

[forest plans] in establishing resource and land use policies for the forests in

question there is little doubt that they are continuing agency action under § 7(a)(2)

of the ESA." 30 F.3d at 1056. Thus, when the chinook salmon was listed as a

threatened species two years after two forest plans had been approved, the Forest

Service was required to reinitiate consultation on the plans. *Id.* The Ninth Circuit

24

reasoned that forest plans "are actions that 'may affect' the protected salmon because the plans set forth criteria for harvesting resources within the salmon's habitat." *Id.* at 1055. The plans set guidelines for logging, grazing, and road-building activities that "may affect" the salmon, and established the allowable sale quantity and production targets for these activities. *Id.* Because the plans "are comprehensive management plans governing a multitude of individual projects" and "every individual project planned in [a] national forest[] . . . is implemented according to the [forest plan]," the effect of a plan is "ongoing and long-lasting." *Id.* at 1053.

The court explicitly rejected the Forest Service's argument, which the Forest Service reiterates here, that forest plans are only agency actions at the time they are adopted, revised, or amended, and they cease to be actions upon their adoption because they do not mandate any particular action and are "'merely' programmatic documents." *Id.* at 1055. The court noted the broad language defining an "action" under the ESA. *Id.* at 1054. The ESA requires consultation on "any action" carried out by an agency, *id.* (citing 16 U.S.C. § 1536(a)(2)), and the Supreme Court has stated that "[t]his language admits of no exception," *id.* (citing *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 173 (1978)). Similarly, the regulatory language is broad:

25

*Action* means *all* activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, *but are not limited to*:
(a) actions intended to conserve listed species or their habitat;
(b) the promulgation of regulations;
(c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or
(d) actions directly or indirectly causing modifications to the land, water, or air.

*Id.* (quoting 50 C.F.R. § 402.02) (emphasis added by Ninth Circuit). "Congress

has spoken in the plainest of words, making it abundantly clear that the balance

has been struck in favor of affording endangered species the highest of priorities,

thereby adopting a policy which it described as 'institutionalized caution.'" *Id.* at

1055 (quoting *Tenn. Valley Auth.*, 437 U.S. at 194).

Unless *Pacific Rivers (1994)* has been "effectively overruled" by

subsequent, higher authority, the parties appear to agree that it mandates the

conclusion that the Lynx Amendment is an ongoing agency action under the ESA

and is thus subject to reinitiation of consultation requirements.

In 2004, in *Norton v. SUWA*, the United States Supreme Court determined

that forest plans are not ongoing agency actions under NEPA. 542 U.S. at 72–73.

NEPA requires that agencies supplement their environmental analysis for "major

Federal actions" if (1) "[t]here are significant new circumstances or information

relevant to environmental concerns and bearing on the proposed action or its

26

impacts," *id.* (citing 40 C.F.R. § 1502.9(c)(1)(ii))," and (2) there remains 'major

Federal action' to occur, as that term is used in [42 U.S.C.] § 4332(2)(C)," *id.*

(quoting *Marsh v. Or. Natural Resources Council*, 490 U.S. 360, 374 (1989)).

NEPA regulations recognize the "[a]pproval of a [forest plan]" as a major Federal

action, 43 C.F.R. § 1601.0-6, but the Court held that "that action is completed

when the plan is approved" and "[t]here is no ongoing 'major Federal action' that

could require supplementation." *Norton v. SUWA*, 542 U.S. at 73.

In *Forest Guardians v. Forsgren*, the Tenth Circuit applied *Norton*'s

reasoning to the ESA and explicitly rejected the Ninth Circuit's approach in

*Pacific Rivers (1994)*. 478 F.3d at 1152–56. It held that an agency is not required

to reinitiate consultation on previously approved forest plans even if new species

or critical habitat are listed after a plan is approved. *Id.* The Tenth Circuit

explained that although all projects must be consistent with the governing forest

plan, the forest plan only provides a framework for later project decisions:

> Plans do not grant, withhold, or modify any contract, permit or other
> legal instrument, subject anyone to civil or criminal liability, or create
> any legal rights. Plans typically do not approve or execute projects and
> activities. Decisions with effects that can be meaningfully evaluated
> typically are made when projects and activities are approved.

*Id.* at 1153 (quoting 36 C.F.R. § 219.3(b) (2007)).[6]  The court reasoned that an

"agency action" includes the adoption of a forest plan, the amendment or revision

of a forest plan, and the proposal and approval of a site-specific project in the

forest.  *Id.* at 1154.  But the forest plan itself is not an "agency action" under the

ESA after its adoption and before it is amended or revised, unless it specifically

authorizes or requires an agency to fund or carry out an activity or  a program.  *Id.*

at 1156.

> A [forest plan] considered in isolation simply is not an ongoing,
> self-implementing document.  Specific activities, programs, and/or
> projects are necessary to implement the plan.  Those same activities,
> programs, and projects must be alleged in a complaint that seeks to
> establish an "acting" agency's duty to consult under § 7(a)(2) of the
> ESA. As we have explained, a [forest plan] envisions the forest will be
> used for multiple purposes, including "outdoor recreation, range, timber,
> watershed, wildlife and fish, and wilderness." A plan or vision is
> certainly a precursor to "agency action," but neither is action requiring
> § 7(a)(2) consultation.

*Id.* at 1158 (citations omitted).

Of course, the Tenth Circuit's decision in *Forsgren* is not binding in this

Circuit.  The opinion does not appear to have been adopted or even cited outside

the Tenth Circuit except by a Ninth Circuit district court, which merely noted,

while following the Ninth Circuit precedent, the Tenth Circuit's express rejection

---

[6]This regulation appeared in the regulations until 2010.  The language does not appear in
the current regulations.

of the conclusion in *Pacific Rivers (1994)* that the ongoing implementation of a forest plan is an action for purposes of the ESA. *Coalition for a Sustainable Delta v. Fed. Emerg. Mgt. Agency*, 812 F. Supp. 2d 1089, 1109 n. 7 (E.D. Cal. 2011). Nor does it appear that any other Circuit has adopted *Pacific Rivers (1994)*'s contrary approach.

Both parties argue that Ninth Circuit case law since *Pacific Rivers (1994)* supports their view concerning whether the case is still good law. Plaintiffs' arguments are more convincing.

The Ninth Circuit distinguishes "agency actions" under the ESA from those under NEPA, noting that it has "repeatedly held that the ESA's use of the term 'agency action' is to be construed broadly." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1024 (9th Cir. 2012) (en banc) ("Although the 'major federal action' standard under NEPA is similar to the more liberal 'agency action' standard under the ESA, the terms are not interchangeable."); *Marbled Murrelet*, 83 F.3d at 1075 (noting that though the agency action standards under NEPA and the ESA are somewhat similar, the distinction in their wording demonstrates that the NEPA requirement for an EIS is "more exclusive" than the requirement under section 7 of the ESA). *See also P. Coast Fedn. of Fishermen's Assns.*, 2007 WL 1752289, *16 n. 5 (E.D. Cal. 2007).

29

Although the Ninth Circuit construes the ESA standard broadly, it has recognized that not all agency actions remaining ongoing after they are approved. *Cal. Sportfishing Protec. Alliance v. F.E.R.C.*, 472 F.3d 593, 597 (9th Cir. 2006). For example, where an agency has already granted a right of way to a logging company or issued an incidental take permit to a contractor, the action has been completed and need not be revisited if a triggering event under 50 C.F.R.§ 402.16 occurs. *Id.* at 598 (citing cases). In *California Sportfishing*, the court focused on the "potential effect of the government's contemplated action," *id.* at 597, and emphasized that some "affirmative action" is necessary for the action to remain ongoing, *id.* at 598 (citation omitted). Citing *Pacific Rivers (1994)*, it confirmed that a forest plan is an ongoing agency action because the plan "continue[s] to apply to new projects" and thus has an "'ongoing and long-lasting effect even after adoption,'" *id.* at 598 (quoting *Pacific Rivers (1994)*, 30 F.3d at 1052)). The Ninth Circuit has also cited *Pacific Rivers (1994)* with approval in *Western Watersheds Project v. Matejko*, stating: "Ongoing agency action also existed in *Pacific Rivers* [*(1994)*.]" 468 F.3d 1099, 1110 (9th Cir. 2006).

Defendants' notice of supplemental authority cites a recent Northern District of California case that held that *Pacific Rivers (1994)* was "implicitly overruled" by the Ninth Circuit in *Karuk Tribe*, 681 F.3d 1006. *Ctr. for*

30

*Biological Diversity v. Envtl. Protec. Agency*, 2013 WL 1729573 (N.D. Cal. Apr.

22, 2013). The case is distinguishable from this case, however. The plaintiffs

alleged the Environmental Protection Agency violated the ESA by failing to

reinitiate consultations on the effects of 382 registered pesticides on listed species.

Each pesticide corresponded to an individual agency act—the approval of the

pesticide. Thus, there were 382 different acts, each of which had to be challenged

independently. Here, on the other hand, there is only one agency act—the

approval of the Lynx Amendment. Additionally, the approval of a pesticide is not

a programmatic regulation or plan amendment that governs later actions.

Presumably, Defendants are interested in the court's interpretation of *Karuk

Tribe*. The court stated that *Karuk Tribe*'s requirement that section 7 only applies

when an agency makes an affirmative act implicitly overruled *Pacific Rivers

(1994)*'s holding that forest plans are ongoing agency actions. *Id.* at *10. The

court's statement was dicta, however, because it was not considering a forest plan.

 Moreover, *Karuk Tribe* did not mark the first time the Ninth Circuit held that an

affirmative act is required to find ongoing agency action under the ESA. In

*Western Watersheds v. Matejko*, the Ninth Circuit noted this requirement and

expressly confirmed that forest plans constitute ongoing, affirmative agency action

because the Forest Service "maintained continuing authority under a

31

comprehensive and long term management plan, that was still in effect." 468 F.3d at 1102, 1111. *See also Cal. Sportfishing*, 472 F.3d at 597–98.

Because the Ninth Circuit has demonstrated continued support for *Pacific Rivers (1994)* in decisions emphasizing that an "affirmative act" is necessary for an agency action to be ongoing, this Court respectfully disagrees with the district court's conclusion that *Karuk Tribe* implicitly overruled *Pacific Rivers (1994)*. Forest plans and programmatic amendments to forest plans are not situations "[w]here private activity is proceeding pursuant to a vested right or to a previously issued license." *Karuk Tribe*, 681 F.3d at 1021. Instead, multiple federal actions stem from those forest plans because a forest plan "continue[s] to apply to new projects." *Cal. Sportfishing*, 472 F.3d at 598. The district court's holding on pesticide regulations is not applicable to forest plans.

In *Karuk Tribe*, the Ninth Circuit explained that an "agency action" inquiry under the ESA is two-fold:

> First, we ask whether a federal agency affirmatively authorized, funded, or carried out the underlying activity. Second, we determine whether the agency had some discretion to influence or change the activity for the benefit of a protected species.

681 F.3d at 1021. Here, the Forest Service affirmatively enacted the Lynx Amendment in order to set broad standards for the management of the Canada

32

Lynx, and it continues to carry out the Lynx Amendment in 18 different forests. All projects proposed or enacted in those forests must be consistent with the Lynx Amendment—thus the Amendment is not merely advisory. It continues to have significant effects each time a new project relying on the Amendment is authorized, and as held in *Sierra Forest Legacy*, a procedural failure related to a programmatic plan cannot be compensated for in a project analysis for a specific site. 646 F.3d at 1180. The Forest Service also maintains discretionary involvement or control over the Lynx Amendment, as evidenced by the fact that in some forests, the Forest Service has voluntarily reinitiated consultation on the Lynx Amendment since new critical habitat was designated.

Given that the Ninth Circuit distinguishes ongoing agency actions under NEPA and the ESA and has cited *Pacific Rivers (1994)* with approval since *Norton v. SUWA* was issued, it is not clear that *Pacific Rivers (1994)* has been effectively overruled. Such a determination is not for this Court to make, even though the Forest Service has presented a pragmatic argument for following the Tenth Circuit's lead. Under Ninth Circuit case law, then, the Lynx Amendment constitutes an ongoing agency action under the ESA. The Forest Service is required to reinitiate consultation on the Amendment if a triggering event under 50 C.F.R. § 402.16 occurs.

33

## IV.  Whether a triggering event occurred

Agencies are required to engage in section 7 consultation whenever an

action "may affect" a listed species.  As the agencies recognized when they first

consulted on the Lynx Amendment, the Amendment "may affect" the lynx and

lynx critical habitat because it provides the broad management direction for 20

forest plans covering 18 separate national forest units.

Though the Forest Service and Wildlife Service consulted on the Lynx

Amendment in 2007, Plaintiffs contend they must re-initiate consultation based on

the subsequent designation of lynx critical habitat.  An agency must reinitiate

consultation in the following circumstances:

> (a) If the amount or extent of taking specified in the incidental take
> statement is exceeded;
> (b) If new information reveals effects of the action that may affect listed
> species or critical habitat in a manner or to an extent not previously
> considered;
> (c) If the identified action is subsequently modified in a manner that
> causes an effect to the listed species or critical habitat that was not
> considered in the biological opinion; or
> (d) If a new species is listed or critical habitat designated that may be
> affected by the identified action.

50 C.F.R. § 402.16.  These events provide a "trigger" to "ensure that the 'no

jeopardy' determination remains valid."  *Ctr. for Biological Diversity v. Salazar*,

695 F.3d 893, 909 (9th Cir. 2012) (citations omitted).

34

The designation of critical habitat in 11 national forests to which the Lynx
Amendment applies satisfies both subsections (b) and (d) of 50 C.F.R. § 402.16.
Since no critical habitat had been designated when the agencies first consulted on
the Amendment, the Bi-Op concluded that "none will be affected." AR 0101(a) at
75. Nor did the Bi-Op address whether the Amendment would impact the Primary
Constituent Elements of lynx habitat. "The analysis of the effects to critical
habitat is a separate and different analysis from that of the effects to the species,
and may provide greater regulatory benefits to the recovery of a species than
listing alone." AR 2535 at 8616, 8624.

The agencies cannot shift this analysis to the project level. *Sierra Forest
Legacy*, 646 F.3d at 1180; *Pac. Coast Fedn. of Fishermen's Assns. v. Natl. Marine
Fisheries Serv.*, 428 F. Supp. 2d 1248, 1267 (W.D. Wash. 2007) (citation omitted);
As the Wildlife Service found in its 2007 Biological Opinion:

> Without programmatic guidance and planning to conserve lynx,
> assessment of land management effects to lynx and development of
> appropriate conservation strategies are left to project-specific analysis
> without consideration for larger landscape patterns.

Bi-Op at 75. A "big picture approach to lynx management" is required. AR
0101(a) at 70. "[L]andscape level direction [is] necessary for the survival and
recovery of lynx in the northern Rockies ecosystem." AR 0101(a) at 70.

35

"[M]anagement activities [can] reduce or degrade essential habitat elements used by lynx for denning, foraging, and recruitment, or [] increase habitat fragmentation and lynx mortality" and "[e]ffects may occur and/or continue without appropriate management direction at broad scales." AR 2375 at 31. The Forest Service cannot now claim the opposite—that project-specific analysis is sufficient to protect the lynx and its habitat in the larger region.

By failing to reinitiate consultation on the Lynx Amendment, the Forest Service violated 50 C.F.R. § 402.16 and section 7 requirements after lynx critical habitat was identified in forests subject to the Amendment. The Forest Service must now reinitiate consultation in order to determine that the Amendment is "not likely to . . . result in the destruction or adverse modification of" designated critical habitat, 16 U.S.C. § 1536(a)(2), "in a way that will affect both the conservation of the species, and its recovery," AR 2535 at 8646. The Forest Service and Wildlife Service must determine "whether, with implementation of the [Amendment], the affected critical habitat would remain functional (or retain the current ability for the [primary constituent elements] to be functionally established) to serve its intended conservation role for the species." AR 2535 at 8644.

## V. Appropriate Relief

36

It is "well-settled that a court can enjoin agency action pending completion of section 7(a)(2) requirements." *Wash. Toxics Coalition v. EPA,* 413 F.3d 1024, 1034 (9th Cir. 2005). Section 7 provides that "[a]fter initiation of consultation required under subsection (a) (2) of this section, the Federal agency . . . shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a) (2) of this section." 16 U.S.C. § 1536(d). Additionally, "the strict substantive provisions of the ESA justify more stringent enforcement of its procedural requirements [than NEPA's procedural requirements], because [the ESA's] procedural requirements are designed to ensure compliance with the substantive provisions." *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985).

The "traditional preliminary injunction analysis does not apply to injunctions issued pursuant to the ESA." *Nat. Wildlife Fedn. v. NMFS*, 422 F.3d 782, 793 (9th Cir. 2005). The Court cannot "balance interests in protecting endangered species against the costs of the injunction when crafting its scope." *Wash. Toxics Coalition*, 413 F.3d at 1035. "Congress has decided that…the balance of hardships always tips sharply in favor of the endangered or threatened species." *Id.* Additionally, the Ninth Circuit has implemented a burden-shifting

37

approach under which an agency that has violated section 7 must prove a particular action is non-jeopardizing in order to avoid an injunction. *Id.* Requiring this proof of the acting agency "is consistent with the purpose of the ESA and what [the Ninth Circuit has] termed its institutionalized caution mandate." *Id.*

Despite this liberal standard for imposing injunctive relief under section 7, Plaintiffs are still obligated to show an irreparable injury to support the issuance and scope of an injunction. In *National Wildlife Federation v. National Marine Fisheries Service*, the Ninth Circuit held that the district court's rejection of a biological opinion under the ESA, together with its finding of irreparable harm, were "precisely the circumstances in which our precedent indicates that the issuance of an injunction is appropriate." 422 F.3d 782, 796 (9th Cir. 2005). The Ninth Circuit also stated in *National Wildlife Federation v. Burlington Northern Railroad* that ESA cases "do not stand for the proposition that courts no longer must look at the likelihood of future harm before deciding whether to grant an injunction under the ESA." 23 F.3d 1508, 1511 (9th Cir. 1994) (internal citations omitted).

Similarly, a district court has held:

Reason dictates that plaintiffs make a showing that the particular

38

injunction they request is necessary to prevent irreparable harm caused by the defendants' violation of the ESA. It could not be the case that any time defendants are found liable for a significant violation of the ESA's procedural provisions, the plaintiffs are entitled to any form of injunctive relief that they request. Indeed, "injunctive relief must be tailored to remedy the specific harm alleged." *NRDC v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007). As a practical matter, the court must decide what irreparable harms are likely to occur to the species in order to craft an appropriately tailored injunction. Here, plaintiff is only entitled to an injunction that prevents irreparable harm caused by defendants' violation of the Endangered Species Act. Thus, even if a showing of irreparable harm was not necessary for an injunction to issue, such a showing is required in order to justify the specific measures that plaintiffs' request. Accordingly, the court holds that plaintiff must show that irreparable harm to the listed species will result from defendants' violation of the ESA in the absence of each measure plaintiffs request.

*S. Yuba River Citizens League v. Natl. Marine Fisheries Serv.*, 804 F. Supp. 2d 1045, 1054 (E.D. Cal. 2011), *reconsideration denied in part,* 851 F. Supp. 2d 1246 (E.D. Cal. 2012).

The practical approach adopted by the district court in *South Yuba River Citizens League* is persuasive. Based on the limited factual support provided by Plaintiffs, the Court cannot analyze in the context of this case whether the harm posed by all projects to take place in Lynx Amendment forests is likely to occur and is irreparable, and there is no basis for the Court to properly narrow the scope of the injunction. Although "[i]rreparable damage is presumed to flow from a failure properly to evaluate the environmental impact of a major federal action,"

39

*Thomas v. Peterson,* 753 F.2d 754, 764 (9th Cir. 1985), and although the "[t]he remedy for a substantial procedural violation of the ESA—a violation that is not technical or *de minimis*—must . . . be an injunction of the project pending compliance with the ESA," *Wash. Toxics Coalition,* 413 F.3d at 1034, Plaintiffs have not met their burden to substantiate the particular relief requested. They have not provided any evidence for assessing the "likelihood of harm" or ensuring that the injunction is "tailored to remedy the specific harm alleged." *Natl. Wildlife Fedn. v. Burlington N.R.R.,* 23 F.3d at 1511; *NRDC v. Winter,* 508 F.3d at 886.

Plaintiffs' decision not to challenge any particular project also imposes an impossible burden on Defendants under the burden-shifting approach of *Washington Toxics*. To show their actions are non-jeopardizing, Defendants would have to show that each action to take place in all the forests subject to the Lynx Amendment will not "appreciably" or "considerably" "diminish the value of critical habitat for both the survival and recovery of the listed species." 50 C.F.R. § 402.02. The Lynx Amendment amended 20 plans affecting 18 forests, 11 of which include critical lynx habitat. Thus, the breadth of injunction requested by Plaintiffs would impose an impossible task on Defendants. If Plaintiffs had substantiated their request with specific showings of irreparable harm, such a burden would be fair. But it is not in the total absence of such evidence.

This approach is consistent with that taken by the Eastern District of California in *Sierra Forest Legacy v. Sherman*, 2013 WL 1627894 (E.D. Cal. Apr. 15, 2013), a NEPA case. As that court found, project-specific injunctive relief may not be appropriate if plaintiffs have not "identified any imminent [project] in any specific area and explained how such [project] will harm their interests." *Sierra Forest Legacy*, 2013 WL 1627894, \*8. "[B]road and untethered allegations of harm cannot serve as the irreparable injury required to demonstrate the need for injunctive relief." *Id.*

Plaintiffs have not met the burden of identifying likely and irreparable harm tied to specific projects in Lynx Amendment forests. "Establishing injury-in-fact for the purposes of standing is less demanding than demonstrating irreparable harm to obtain injunctive relief." *Id.* at \*8 n. 6 (citing *Carribean Marine Serv. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988), and *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n. 6 (9th Cir. 2011)). Here, Plaintiffs merely state that the lack of landscape-level analysis will impair their ability to view lynx in the Bozeman Municipal Watershed Project and the East Boulder Project areas. They make no showing that the harm is likely to occur despite the site-specific analyses or that the harm is irreparable. Accordingly, these projects will not be enjoined. Nor have Plaintiffs made a sufficient showing of likely, irreparable harm to

41

support the injunction of any other projects.  Thus no projects will be enjoined in this case, but the Forest Service must reinitiate consultation on the Lynx Amendment.

**CONCLUSION**

For the reasons discussed above,

IT IS ORDERED that Defendants' motion for summary judgment (doc. 22) is DENIED, and Plaintiffs' motion for summary judgment (doc. 17) is GRANTED, as follows: the Forest Service shall reinitiate consultation on the Lynx Amendment, but no specific projects are enjoined because Plaintiffs have not made an adequate showing of irreparable harm to obtain the relief requested.

This case is closed.

Dated this 16th day of May 2013.

Dana L. Christensen, Chief Judge
United States District Court

42